THE CHARITABLE SOCIETY OF HARTFORD *vs.* THE FARMERS AND MECHANICS' BANK.

The act of 1855, which provides that "all banks and banking associations organized under the act of 1852, authorizing the business of banking in this state, shall, in addition to the number of shares authorized, be opened to subscription from the funds of this state, the school fund, or from the funds of any college, ecclesiastical society, school corporation, or association for charitable purposes, &c., provided that such additional subscriptions shall in no case exceed ten per cent. of the amount of the capital of any bank or banking association actually paid in," applies only to the banks organized under the act of 1852, and not to the chartered banks.

THIS was a petition in chancery to compel the respondents to allow the plaintiffs to subscribe for five shares of stock.

The bank was chartered in 1832, its capital consisting of 5,000 shares of $100 each, to be subscribed for by the public. The 10th section of the act of incorporation contained the following provision: "In addition to the subscription hereinbefore authorized, said bank shall at all times be opened for subscription, at the rate of one hundred dollars each share, from the funds of this state, the school fund, or from the funds of any college, ecclesiastical society, school, or corporation for charitable purposes, within this state. Provided, nevertheless, that the shares so subscribed shall not be transferable, but may at any time be withdrawn on twelve months' notice to the directors; and that the shares so subscribed shall never exceed twenty-five per cent. of the shares subscribed by individuals."

In 1855 an act was passed entitled "an act in relation to banks," which was approved on the 26th of June, and which was as follows: "All banks and banking associations organized under the Act of 1852, authorizing the business of banking in this state, shall, in addition to the number of shares authorized, be opened to subscription from the funds of this state, the school fund, or from the funds of any college, ecclesiastical society, school corporation, or association for charitable purposes, within this state; which stock so subscribed shall not be transferable, and may be withdrawn at any time on giving twelve months' notice to the bank: provided, that such additional subscriptions shall in no case exceed ten per cent. of the amount of the capital stock of any bank or banking association actually paid in, any law or usage to the contrary notwithstanding."

The act of 1852, referred to in the foregoing act, was a general statute authorizing the business of banking, and known as the Free Banking Law, under which numerous banks had been organized. An act approved on the 16th day of June, 1855, conferred upon these banks the general privileges of chartered banks, on certain terms to be accepted

by them, and provided that no new banks should be organized under the act of 1852.

On the 28th of January, 1857, the petitioners, who were a charitable corporation, applied to the respondents to be allowed to subscribe for five shares of the additional stock provided for by the 10th section of their charter, and tendered $500 as the amount of the five shares. The number of shares taken under that section was, at that time, 1,245, leaving five more to be taken, according to its provisions. The respondents refused to allow the subscription, on the ground that by the act of 1855 no bank was required to take subscriptions of that character to an amount exceeding ten per cent. of its regular capital; and the question as to the right of the petitioners to make such subscription was reserved for the advice of this court.

*Matson*, for the petitioners, contended that the 10th section of the charter of the respondents, under which it was clearly their duty to allow the subscription in question, was not affected by the act of 1855, which was intended to apply only to the banks organized under the act of 1852; and that it was clear that this application only was intended, because any other construction would do violence to the language, the expression "all banks and banking associations organized under the act of 1852" naturally meaning but a single class of banks, while the tautology involved in this construction is only what is found in almost all statutes; and because the time and occasion of the passage of the act, a few days after the repeal of the general banking law and the passage of an act conferring on the banks organized under that law the privileges of chartered banks, making necessary this as well as some other supplemental legislation with regard to them, indicated very clearly that the legislature had in mind, in passing the act, only the banks concerning which they had so recently legislated.

*Hungerford*, for the respondents, contended that the object of the act of 1855 was to equalize the burden with respect to

this class of subscriptions, between the banks organized under the act of 1852 and the chartered banks, and that as it was supposed that banks had so much increased in number as to make it unnecessary to allow such subscriptions to the same extent as before, the equalization was effected by reducing the amount in all cases to one-tenth of the capital paid in, on any other supposition the burden being imposed unequally on the two classes of banks, without any reason for such inequality; that in the construction of the act, a sensible meaning is to be attached, if possible, to all the words used, and that the term "banks and banking associations" is to be presumed to mean two classes of banks, rather than to be taken as idle tautology, especially as the words would have been connected by the disjunctive "or" rather than the conjunctive "and" if the second term were intended only as a more explicit expression of the same idea that had been expressed in the first; that while the term "banks" was specially appropriate to the chartered banks, and the term "banking associations" equally appropriate to the institutions organized under the general law, the former being created by special act of the legislature, and the latter formed by mere voluntary association, the latter term had in fact been generally used in our statutes to designate the latter class of banks, the act of 1852 itself, in every instance but one, and that in speaking of them as banks of discount and deposit, using the term "banking associations" or "corporations organized under this act;" and that whatever ambiguity might exist in the body of the act, was explained by the proviso, which was entirely free from ambiguity, and which provided that such subscriptions should in no case exceed ten per cent. of the amount of the capital stock of "any bank or banking association," &c.

STORRS, C. J. The tenth section of the charter of the defendants, which was granted in 1832, requires that their bank, in addition to the subscription of its permanent capital stock therein before authorized, "shall, at all times, be open for subscriptions to its stock, at the rate of one hundred dol-

lars each share, from the funds of this state, the school fund, or from the funds of any college, ecclesiastical society, school or corporation for charitable purposes within this state; provided that the shares so subscribed shall not be transferable, but may at any time be withdrawn on twelve months' notice to the directors, and that the shares so subscribed shall never exceed twenty-five per cent. of the shares subscribed by individuals." As the subscriptions to the defendants' bank of the class of stock thus specially provided for, are now less by five shares than the defendants are required by this provision to receive, the plaintiffs, being a charitable association, are plainly entitled to take that number of shares, unless the defendants are exonerated from receiving a subscription therefor, either by the 243d section of the act concerning communities and corporations, (Rev. Stat., tit. 3d,) or by the act of 1855, in relation to banks, (Acts of 1855, ch. 10, p. 10.) In regard to the first, it is obvious, and indeed is not controverted, that that section was intended to apply only to those banks in whose charters there is no special provision requiring them to receive subscriptions other than for what is termed ordinary and permanent stock, and that therefore it does not affect the defendants, by whose charter, granted since that enactment, they were, as has been stated, specially required to receive subscriptions by the state, the school fund, and ecclesiastical, educational, and charitable institutions. The question then, and the only one on which the case has been put in the argument, is, whether the tenth section of the defendants' charter, which has been recited, is superseded or modified by the act of 1855. That act requires that "all banks and banking associations organized under the act of 1852, authorizing the business of banking in this state," shall, in addition to their permanent stock, be open to subscriptions from the funds of this state, the school fund, and the institutions which we have before mentioned; declares that the stock so subscribed shall not be transferable, and may be withdrawn on twelve months' notice to the bank; and provides that such additional subscriptions shall in no case exceed ten per cent. of the amount of the capital stock of

any bank or banking association actually paid in. We are of the opinion that this act ought not to be held applicable to any other banking institutions than those which had been organized under the act of 1852, therein mentioned, and that therefore the plaintiffs are not absolved by it from receiving subscriptions to the privileged stock mentioned in the 10th section of their charter, to the full amount required by that section. The act is very ambiguously expressed in regard to the kind of banking institutions to which it refers, and its language is susceptible, without violence, of being applied not only to such of those institutions as were formed under the act of 1852, but also to those which, like that of the defendants, were created by special charters, if there was any satisfactory evidence to show that the latter were intended to be embraced by it. In the absence, however, of any such evidence, and there is none before us excepting that which is derived from the most vague conjecture, we think that the operation of the act should be confined to the former of those institutions, which are clearly embraced by it. We are confirmed in this construction by other considerations which have a more direct bearing on the question. The time and occasion of passing this act strongly indicate that it was called forth by the legislation of the same session in regard to the banks which had been organized under the general banking law of 1852, and that it was therefore designed to apply only to those banks. A law had just been enacted, prohibiting the organization or establishment of any new banking association under the provisions of that general law, but providing that those which had been organized, and were in operation under it, should, on their compliance with certain prescribed conditions, continue to be incorporations for the purposes for which they were established, as if they had been severally established by special charters from the legislature. It was morally certain that those associations would comply with those conditions, and avail themselves of the benefit of this act, as it would place them in a much more eligible situation than the general banking law. But, however that might be, the legislature evidently deemed it just to

subject all the banks which had been formed under that general law, to the same burden of receiving privileged subscriptions to their stock, to a certain extent, from the funds of the state and school fund, and of certain institutions, by which the general welfare of the state was especially promoted, as had been imposed upon the banks which had been incorporated by special charters, but to which banks formed under the general banking law had not been subjected. It was for the purpose of thus onerating those banks only which were then free from that burthen, that the law now in question appears to have been passed. It was required for no others, unless, without any historical or other evidence, we assume that it was the further design of the legislature to relieve them, in regard to such subscriptions, from some of their express charter obligations. As those obligations formed the consideration for the privileges which their charters conferred, we do not feel at liberty to put such a construction upon an act which does not appear to have been passed with any reference to them, as to supersede or vary those obligations. It is sufficient for us that it is doubtful, from the act in question, whether it was designed to embrace the specially chartered banks, and that nothing has been presented to us to remove that doubt. It may be added, that the construction we have adopted is critically more in accordance than any other, with the mode of expression used in the first sentence of this act, to designate the institutions to which it was designed to relate, although even a different punctuation would, perhaps, have evinced a different intention. It is true, as suggested by the plaintiffs, that the meaning given by us to that sentence, renders it apparently tautological; that, however, is not a decisive objection, and ought not, in our opinion, to outweigh the considerations which have been mentioned.

We advise a decree in favor of the plaintiffs.

In this opinion the other judges concurred.

Decree for petitioners advised.